## In re JONES.

**(District Court, N. D. New York. August 4, 1919.)**

BANKRUPTCY ⚬166(2)—ACTS OF BANKRUPTCY—TRANSFER OF PROPERTY TO
CREDITOR.

A debtor, who within four months before bankruptcy proceedings against him and when insolvent transferred practically all his property of value as security to two creditors, *held* chargeable with knowledge of his insolvency and with an intent to prefer such creditors, which rendered the transfers acts of bankruptcy.

In Bankruptcy. In the matter of Pryce W. Jones, alleged bankrupt. On review of findings of special master that allegations of acts of bankruptcy were not sustained. Findings reversed, and adjudication ordered.

David H. Demarest, of Gloversville, N. Y., for petitioning creditors.

James H. Wood, of Gloversville, N. Y. (Frank Talbot, of Gloversville, N. Y., of counsel), for alleged bankrupt.

RAY, District Judge. The petition against the alleged bankrupt was filed December 2, 1918, and alleged the following as acts of bankruptcy:

"That within four months preceding the filing of this petition, viz. on or about the 8th day of September, 1918, the said Pryce W. Jones, while insolvent, committed an act of bankruptcy, in that he did transfer to the City National Bank of Gloversville, N. Y., about $27,000 worth of stock of the Jones & Miller Company, Incorporated, of Gloversville, N. Y., with intent to prefer said creditor over other creditors of the same class. That on or about the 8th day of September, 1918, the said Pryce W. Jones, while insolvent, committed an act of bankruptcy, in that he did transfer to Mrs. Fulton V. Bard, of Gloversville, N. Y., about $7,000 worth of stock of the Jones & Miller Company, Incorporated, with intent to prefer said creditor over other creditors of the same class."

The petition alleges insolvency at the time of the commission of such alleged acts, and insolvency was not denied in the answer of the bankrupt, but the commission of the acts of bankruptcy alleged was.

The special master finds:

(1) That September 7, 1918 (which was within four months of the filing of the petition in bankruptcy), said Pryce W. Jones was the owner of 145 shares of the stock of the Jones & Miller Company, of Gloversville, N. Y.

(2) Of such shares of stock 30 shares were then pledged to the Fulton County National Bank, of Gloversville, N. Y., as security for a loan of money.

(3) September 7, 1918, said Pryce W. Jones was indebted to the City National Bank of Gloversville, N. Y., in the sum of $12,000 on notes, exclusive of some interest, and was indebted to Lena Bard in the sum of $3,000 on notes, exclusive of some interest.

(4) The estate of one Roy S. Miller, deceased, was at such time indebted to the said City National Bank in the sum of $12,000, and some accrued interest, on notes which were indorsed by said Pryce

W. Jones, and to said Lena A. Bard in the sum of $3,000, and some interest, on notes indorsed by said Pryce W. Jones. The said estate of Roy S. Miller owed other obligations to the amount of $1,252.81.

(5) The said estate of Roy S. Miller, deceased, owned at the time 200 shares of the stock of said Jones & Miller Company.

(6) September 7, 1918, the above condition existing, the representatives of the estate of Roy S. Miller, deceased, transferred his 200 shares of said stock to said Pryce W. Jones, and he gave 170 shares of such 200 shares to the said City National Bank as collateral security for a new note made by him to said bank for $13,860, and Jones, as further security, transferred to the said bank 71 shares of his own stock previously owned by him.

(7) As a part of this transaction the indebtedness of the estate of Roy S. Miller to said City National Bank was canceled.

(8) On the same date, and as a part of the same transaction, Pryce W. Jones transferred the balance of the stock received by him from the Miller estate, 30 shares, and also the balance of the said stock previously owned by him, 44 shares, to Lena A. Bard, to secure the payment of his note held by her for the sum of $3,000, and Lena A. Bard canceled the indebtedness of the estate of Roy S. Miller to her.

(9) The said Miller stock so transferred to Jones never went to his possession actually.

(10) The Jones & Miller Company paid to the estate of Roy S. Miller $1,252.81, and charged same to the account of Pryce W. Jones, increasing his indebtedness by that sum.

(11) The special master says, basing the finding on the above facts:

"Jones paid in all $18,112.00, and acquired 200 additional shares of the Jones & Miller Company, worth nearly par. In addition, his liability on the Miller notes was extinguished. The only act of his which might be construed as an act of bankruptcy was the pledge of his own stock as collateral to the new loans."

And the special master further says:

"The sole remaining issue is as to whether or not the transfers were made with intent to prefer creditors and thus constituted an act of bankruptcy. Jones realized that, because of the dry vote in Gloversville, he was about to lose the benefit of the bar trade at the Hotel Windsor, which he was conducting at the time. He had previously considered his equity in the hotel business worth from $20,000 to $25,000. He must have known his hotel business would depreciate considerably in value. I do not believe even he knew at the time how much the depreciation would be. I am convinced that he intended to get his business matters in such shape that he could dispose of his hotel business and again enter actively into the business of the Jones & Miller Company, where he would have an opportunity to rehabilitate his impaired finances. There does not seems to me to be any intention here on the part of Pryce W. Jones to pay the City National Bank and Lena A. Bard at the expense of other creditors, but simply a desire to relieve himself from liability on the Miller notes, to permit a settlement of the Miller estate, to acquire the Miller estate holdings of stock in the Jones & Miller Company, and thus put himself in a position where he could give up the hotel business, go into the Jones & Miller Company again, and eventually meet his obligations. That on such facts it is my opinion, and I do therefore recommend, that the transfers, although made while insolvent, were not made with intent to prefer creditors, and were not, therefore, acts of bankruptcy, and in my opinion the petition filed against the above-named alleged bankrupt should be dismissed."

It is a firmly settled rule of law that a person of intelligence and sound mind is presumed to intend the known and natural results or consequences of his voluntary acts. However, an insolvent person who is actually engaged in business, and who in good faith intends to continue business, and who expects to continue business and pay his indebtedness, especially if he has any well-grounded expectancy of being able to do so, may pay one creditor in full, paying the others nothing at the time, without being charged with intent to give a preference, within the meaning of section 3a of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 546 [Comp. St. § 9587]), which provides:

"Acts of bankruptcy by a person shall consist of his having (1) conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, any part of his property with intent to hinder, delay, or defraud his creditors, or any of them; or (2) transferred, while insolvent, any portion of his property to one or more of his creditors with intent to prefer such creditors over his other creditors."

In this case it is claimed by the alleged bankrupt that at the time of the transaction referred to and questioned in this case as an act of bankruptcy, and it occurred about three months prior to the filing of the petition against him: (1) That he did not then know he was insolvent; (2) that he then intended to go on with his business; and (3) that he had no intent to prefer one creditor over another, but in good faith honestly and sincerely expected to continue his business and pay all his creditors in full. A person is chargeable with knowledge of a fact which it is his interest to know, and which he would know if he inquired into and mentally digested and reasoned on the facts actually within his knowledge. Conditions must be such as to put him on inquiry.

The alleged bankrupt, Pryce W. Jones, had an interest under a lease in the Windsor Hotel at Gloversville and was engaged in running same. He claims that he honestly regarded his interest in the hotel as worth $20,000 or more in early September, 1918. He owned this lease mentioned and some furniture and fixtures. In August, 1918, he made a financial statement, in which he represented his interest in the hotel as worth $20,000, or about that sum.

An admission in the answer of insolvency existing at the time of the transfer does not prove that the alleged bankrupt then knew he was insolvent, or was possessed of knowledge which charges him with knowledge at that time of his then insolvency. But I do not see on what theory the special master could find that Pryce W. Jones had any idea or expectancy of continuing his hotel business, and in fact the special master does not find that he did. Nor can I see any basis for a finding that Jones had any well-grounded hope or expectancy of continuing his connection with the Jones & Miller Company, Incorporated, for Jones parted with all his stock in that company. He was owing over $30,000, and after the transaction referred to he was owing over $20,000, and had nothing left but his equity under a lease in the Windsor Hotel and fixtures. Gloversville had "voted dry" in April, 1918, and in October the bar was closed, and this

Jones knew, and in this proceeding the depreciation of the value of the hotel lease is all attributed to this fact. In December the hotel was turned over to the owner in fee, he paying nothing for the surrender of the lease, and the fixtures sold for about $2,360. It is plain that Jones knew in September that his bar trade and hotel business was not a paying business; that the lease, if ever worth $20,000, was no longer of that value, or anything near it; and that he could not pay his indebtedness. He parted with all his property, except his interest under this hotel lease.

It is immaterial in this proceeding whether or not the bank and Mrs. Bard knew Jones was insolvent, or whether they had reasonable cause to believe he was insolvent, and that his transactions would result in a preference. If Jones knew he was insolvent, and if he intended to prefer Mrs. Bard, he committed an act of bankruptcy. Whether that preference can be recovered depends on her knowledge, and whether or not she had reasonable cause to believe Jones was insolvent, and that the transaction would result in her receiving a greater percentage of her claim than other creditors of the same class would receive. The evidence of Jones does not commend him to favorable consideration. His answers were evasive and not straightforward. His ignorance, or pretended ignorance, of his affairs and indebtedness and values is not credible. If he possessed ordinary intelligence in early September, he knew he was insolvent, and when he disposed of all his stock referred to it became apparent he had no hope or expectancy of continuing in that business. When we find he paid some creditors and secured others, to the exclusion of the great number of his creditors, knowing his insolvent condition at a time when his hotel business was depreciating rapidly, it becomes evident he intended to prefer some of his creditors to the exclusion of others from a share in his property.

The claim that the estate of Jones was increased, and not diminished, by the transactions between the bank, the Roy S. Miller estate, Bard, and Jones has no support in the evidence. The whole transaction was carried on as one, and its net result is what we are to consider. In his testimony Jones goes to the extent of professing ignorance of what was done, and how it was done; but he knew the result of the transaction.

The conclusion is irresistible that Jones knew he was insolvent, as he admits he was, and that he intended the known, natural, and inevitable consequences of his acts, which were to give a preference as charged in the petition. Many pertinent facts are not found or referred to by the special master. I am unable to find any evidence in the record that Jones had any intention in September of abandoning the hotel business, and resuming business with or in connection with the Jones & Miller Company, or taking up any other business. True, certain of the stock in the Jones & Miller Company was transferred to him in form; but as a part of the same transaction he disposed of some of it absolutely and pledged the balance as security for a new note for old obligations, not a note for a new consideration, but one representing old indebtedness, and as a part of

the same transaction he disposed of all his stock in that company he had previously owned. He changed the form of his indebtedness, and also increased it in some directions, giving security by the assignment of his newly acquired stock and stock previously owned, and his indebtedness to Mrs. Bard was paid, and that to the bank secured, all at the expense of his other numerous creditors. The natural, known, and inevitable result of his acts was to prefer, not only Mrs. Bard, but the bank; and this must be and is, the finding and holding. It is equally plain that Jones knew this result would follow from his acts, and the finding must be and is that Jones not only created and gave a preference, but intended so to do. Clearly he committed the acts of bankruptcy charged in the petition, and such is the finding and holding.

The findings, holdings, and recommendations of the special master, as above quoted, that in making the transfer of his property there was no intent to prefer, are reversed, and there will be an order of adjudication in accordance with the above findings of the court.